563 So.2d 298 (1990)
Irene F. BATES
v.
James B. DENNEY, M.D. et al.
No. 89 CA 0401.
Court of Appeal of Louisiana, First Circuit.
May 10, 1990.
Writ Denied September 14, 1990.
*299 Robert D. Hoover, Scott Gegenheimer, Baton Rouge, and J. Thomas Anderson, Hammond, for plaintiff-appellant, Irene F. Bates.
William S. Penick, New Orleans, for defendants-appellees.
Before LOTTINGER, CRAIN and LeBLANC, JJ.
CRAIN, Judge.
Emery Ray Bates, age 33, was brought to the Emergency Room of Seventh Ward General Hospital in Hammond on August 1, 1985. His chief complaint was that he had fallen down a flight of stairs at his home and, consequently, his ribs ached. On examination the patient was noted to have what appeared to be scratches or cuts on his wrists which he described as cat scratches.
Irene Florence Bates, the patient's mother, related to the Emergency Room physicians, Dr. Edmond Spiller and Dr. Howard Newman, that she was concerned that her son was suicidal and requested that he be hospitalized. She stated that he had a history of psychiatric illness and associated hospitalizations; had been hospitalized on two separate recent occasions (May and July, 1985) for suicide attempts; had subsequently discontinued taking his medications; and had recently stated on several occasions that he wanted a gun to kill himself. The patient denied any suicidal ideation and refused to voluntarily commit himself for psychiatric hospitalization.
Dr. Newman consulted by telephone with Dr. James B. Denney, the psychiatrist who had treated Mr. Bates during his recent psychiatric hospitalizations, regarding the recommended course of treatment of Mr. Bates. Dr. Newman and Dr. Denney agreed that Mr. Bates should be sent home from the Emergency Room to the care of his family; that the family closely observe Mr. Bates and keep all weapons from his access; and that an appointment for Mr. Bates to see Dr. Denney be scheduled for the following morning.
On the morning of August 2, 1985, Mr. Bates died from a self inflicted contact gunshot wound to the right temple. Subsequently, Mrs. Bates instituted this action against Dr. Denney, Dr. Newman and their respective insurers. Trial of the matter proceeded against Dr. Denney and his insurer.
After trial on the merits the jury returned a unanimous verdict in favor of defendants. Plaintiff has appealed alleging two assignments of error. In the first assignment of error appellant alleges that the trial court erroneously refused to "allow evidence of prior similar accidents." In the second assignment of error appellant alleges that the jury's determination that the conduct of Dr. Denney was neither negligent nor substandard is clearly erroneous and is not supported by the evidence.

*300 ADMISSION OF EVIDENCE OF SIMILAR INJURIES
During cross examination of Dr. Denney at trial, counsel for plaintiff sought to impeach the testimony of Dr. Denney with alleged prior inconsistent statements given in a pre-trial deposition. Counsel for plaintiff offered to introduce Dr. Denney's deposition into evidence. Defense counsel joined in the offer.
Subsequent to admission of the deposition, plaintiff's counsel sought to question Dr. Denney regarding a prior malpractice claim which involved the attempted suicide of a female psychiatric patient while out on pass from a psychiatric hospital. Defense counsel objected to that line of questioning and moved for a mistrial. Plaintiff's counsel argued that line of questioning was permissible because evidence of prior accidents is admissible to show a dangerous condition and defendant's knowledge of that condition (the danger of allowing a potentially self-destructive patient to be treated outside of a hospital setting). The trial judge sustained the objection and denied the motion for a mistrial. Plaintiff's counsel then proffered a certified copy of the judgment from the prior malpractice suit and requested to read into the record the testimony from the discovery deposition regarding the prior claim. The trial court responded that defense counsel need not read it, he need just proffer the deposition and cite the pertinent pages into the record.
Plaintiff's counsel then requested to read the pertinent deposition testimony to the jury on the basis that defense counsel had joined in the offering of the deposition. The request was denied. The trial court later refused the request of plaintiff's counsel to refer to the pertinent sections of the deposition in closing arguments.
The use of prior accidents is only admissible where the prior accidents are closely related in circumstances to the injury or hazard at issue. Lincecum v. Missouri Pacific Railroad Co., 452 So.2d 1182 (La.App. 1st Cir.), writ denied, 458 So.2d 476 (La.1984). To be relevant the other accidents "should occur at substantially the same place and under substantially the same conditions and must be caused by the same or a similar defect, danger, act or omission. Evidence of other accidents occurring at substantially different places or under different circumstances or conditions is irrelevant and inadmissible." Lee v. K-Mart Corp., 483 So.2d 609, 613 (La.App. 1st Cir.1985), writ denied, 484 So.2d 661 (La.1986).
The prior suit involved different plaintiffs and other named defendants in addition to Dr. Denney; a different patient; occurred several years prior to the instant case; and arose under different circumstances. The determination of whether certain evidence is relevant is within the discretion of the trial court and will not be set aside absent an abuse of discretion. Citizens Bank & Trust Co. v. Consolidated Terminal Warehouse, Inc. 460 So.2d 663 (La.App. 1st Cir.1984). After careful review of the record we find no abuse of discretion.
Additionally, plaintiff contends that since defendant joined in the offering of the deposition without contemporaneously objecting to the language dealing with the prior claim, defendant waived such objections.
Although defense counsel joined in the offering of the deposition at trial, it is clear from the record and the circumstances under which the deposition was offered, that defense counsel acquiesced in the introduction of the deposition for impeachment purposes regarding prior inconsistent statements, only. Generally, the failure to object to evidence admitted during trial constitutes a waiver of the right to object to its admissibility. Harrigan v. Freeman, 498 So.2d 58 (La.App. 1st Cir.1986). However, in the present case, when plaintiff's counsel questioned Dr. Denney about the prior malpractice claim, defense counsel immediately objected on the grounds that the issue was prejudicial and irrelevant. He continued to object each time the prior claim issue arose. Thus, the objection to deposition testimony regarding the prior *301 malpractice claim was not waived. See State v. Henry, 352 So.2d 643 (La.1977).
This assignment of error is without merit.

NEGLIGENCE OF DR. DENNEY
In the second assignment of error plaintiff alleges that the verdict in favor of Dr. Denney was clearly wrong.
Mr. Bates had a history of mental illness which commenced in adolescence and continued to the time of his death. Mr. Bates was hospitalized in May, 1985, for attempting suicide by shooting himself in the abdomen. Dr. Denney was consulted during the time that Mr. Bates was being treated as a patient at Seventh Ward General Hospital for the gunshot wound and Mr. Bates was subsequently transferred to Greenbriar Hospital (a psychiatric facility). He was discharged from Greenbriar on June 17, 1985, and was at that time considered to be non-suicidal. He did not keep a follow-up appointment with Dr. Denney which was scheduled for June 28, 1985.
On July 7, 1985, Mr. Bates was readmitted to Greenbriar following his having ingested an overdose of sleeping pills. There was some controversy at trial regarding the origin of the sleeping pills, i.e. whether they belonged to Mrs. Bates or had been prescribed for Mr. Bates by Dr. Richard Strobach, a psychiatrist who was treating Mr. Bates independently of and during the time that he was being treated by Dr. Denney. It is unclear whether Dr. Denney was aware that Dr. Strobach was treating Mr. Bates during the time he was being treated by Dr. Denney.
Dr. Edmond Spiller was the attending Emergency Room physician who initially examined Mr. Bates on August 1, 1985. In addition to the nurse's notes Dr. Spiller noted that Mrs. Bates stated that Mr. Bates' behavior had changed significantly; he no longer took his medication; and he wanted a gun to kill himself. To the question, "[D]id Mr. Bates, himself, ever tell you or did he ever say or do anything in your presence, to indicate to you that he was considering or planning suicide?", Dr. Spiller responded, "No." He further stated that at the time Dr. Spiller's shift ended he had not reached a conclusion regarding whether Mr. Bates should be involuntarily hospitalized and that there was no clearcut answer.
After Dr. Spiller's shift ended at 6:00 p.m., Dr. Howard Newman assumed Emergency Room duty. Dr. Newman is Board Certified in Emergency Medicine and was accepted by the court as an expert in that field. Further, he had been practicing medicine for 12 years. Dr. Spiller briefed Dr. Newman on Mr. Bates' complaints and of his family's concern that he was actively suicidal.
Dr. Newman testified that Mrs. Bates related to him the suicide threats made by Mr. Bates. However, when questioned by Dr. Newman regarding whether he was contemplating suicide, Mr. Bates denied having any suicidal ideation. Mr. Bates refused to voluntarily be admitted to a psychiatric ward or hospital. He stated that he was upset because he could not communicate with his family and that every time he said something adverse his family wanted him hospitalized.
Dr. Newman performed a mental status evaluation of Mr. Bates. Among the criteria used in evaluating the mental status of an individual are: the person's speech, judgment, orientation, memory, mood, appearance and whether he is hallucinating or is delusional. Other than noting somewhat slurred speech which Dr. Newman felt had long existed, Dr. Newman did not find Mr. Bates' behavior to be abnormal; although he appeared to be upset over his family's insistence on his hospitalization.
Dr. Newman testified that he then consulted with Dr. Denney relating to him Mrs. Bates' concerns; that Mr. Bates denied being suicidal; that Dr. Newman had evaluated Mr. Bates' mental status; that Dr. Newman believed Mr. Bates to be telling the truth; Mr. Bates' anxiety over his family's attempt to hospitalize him; and that in Dr. Newman's opinion there was a possibility that the involuntary hospitalization of Mr. Bates would be counterproductive. He told Dr. Denney that it was *302 not necessary for Dr. Denney to see Mr. Bates that evening. He related to Dr. Denney that in his opinion, Mr. Bates was not psychotic or out of touch with reality nor did he appear to be depressed. Dr. Newman stated that he and Dr. Denney agreed that Mr. Bates should be sent home that night in the care of his family; that he was to see Dr. Denney in the morning; and that the family was to be instructed to closely observe him and to be certain that no weapons were accessible to him.
Dr. Richard Strobach, accepted by the court as an expert in psychiatry, testified on behalf of plaintiff. On June 7, 1985, Mr. Bates presented for an office visit with Dr. Strobach. The reason given by Mr. Bates for the office visit, was to obtain a second opinion and because Dr. Denney was "mean" in that he refused to prescribe the medications which Mr. Bates requested. Dr. Strobach prescribed three of the requested medications, among them Parnate. On July 7, 1985, Mr. Bates was admitted to Greenbriar Hospital by Dr. Denney as a result of Mr. Bates' having ingested an overdose of sleeping pills. Dr. Strobach testified that on July 11, 1985, Mr. Bates had an appointment with Dr. Strobach at Dr. Strobach's office during the period that Mr. Bates was hospitalized at Greenbriar and being treated by Dr. Denney. There was conflicting evidence on the issue of whether Dr. Strobach actually conferred with Mr. Bates at Dr. Strobach's office or whether Mr. Bates merely telephoned Dr. Strobach from Greenbriar on July 11. Mr. Bates was discharged from Greenbriar on July 15, 1985. On July 25, 1985, Mr. Bates again was seen by Dr. Strobach at Dr. Strobach's office. On that date Mr. Bates appeared very anxious and told Dr. Strobach that he had gotten confused in taking his medication and had taken 6 Parnates at one time (which was in excess of the recommended dosage). Dr. Strobach asked Mr. Bates whether he had attempted suicide on the 25th by taking the 6 Parnates. Mr. Bates denied any suicidal ideation. Dr. Strobach exercised his clinical judgment and apparently concluded that at that point in time he could rely on Mr. Bates' denial of suicidal thoughts or actions. In Dr. Strobach's opinion, Dr. Denney's exercise of clinical judgment on August 1, 1985, giving credence, in part, to Mr. Bates' denial of suicidal ideation to Dr. Newman and other Emergency Room personnel, and Dr. Denney's reliance on Dr. Newman's evaluation of Mr. Bates which resulted in Dr. Denny's failure to hospitalize Mr. Bates or recommend Mr. Bates' hospitalization to Dr. Newman, constituted negligence and was not commensurate with the standard of care.
Dr. Aris Coxe was accepted by the court as an expert in psychiatry and forensic psychiatry. In Dr. Coxe's opinion, Dr. Denney should have involuntarily admitted Mr. Bates on August 1, 1985, because by history, Mr. Bates was chronically suicidal and thus should have been considered to be a serious suicide risk who could best be protected in a hospital setting. On cross-examination, Dr. Coxe was asked why does a psychiatrist question a patient regarding whether the patient is acutely suicidal. Dr. Coxe responded that the psychiatrist seeks to determine whether the patient will discuss suicide, whether he is thinking about it, or has evolved a suicide plan. He then stated that when the patient denies suicidal ideation the psychiatrist must then make a judgment call as to whether the denial is truthful.
Doctor Herman Colomb was accepted by the court as an expert in psychiatry. He stated that a chronically suicidal person is one who has a suicide potential over a long period of time with periods of remission alternating with acutely suicidal states. In Dr. Colomb's opinion during the August 1, 1985, Emergency Room visit, Mr. Bates did not appear to be acutely suicidal in that he was rational, was not under the influence of alcohol or drugs, was not psychotic and did not betray real signs of suicidal ideation. He stated that it is commensurate with the standard of care to treat chronically suicidal patients who are in remission (not acutely suicidal) both inside or outside of a hospital environment and that chronically suicidal patients who are in remission cannot be locked up indefinitely. Additionally, Dr. Denney's reliance on Dr. Newman's *303 evaluation of Mr. Bates was commensurate with the standard of care: Dr. Newman was a family practitioner; was board Certified in Emergency Medicine; had twelve years of medical experience; had previously dealt with suicidal patients; and both Drs. Newman and Denney recognized the high risk of suicide presented by Mr. Bates when they developed the treatment plan.
Dr. Lewis Cenac, accepted by the court as an expert in psychiatry, was a member of the Medical Review Panel which had voted unanimously that Dr. Denney's treatment of Mr. Bates on August 1, 1985, was commensurate with the standard of care. Dr. Cenac testified that Dr. Denney's decision to not involuntarily hospitalize Mr. Bates, and his failure to recommend the patient's hospitalization to Dr. Newman did not breach the standard of care. Among the factors considered in reaching this conclusion were: Dr. Denney knew the patient and the clinical circumstances (a concerned family, his psychiatric history); a follow-up appointment was given for the following day; and he recommended close observation of the patient to the family. In Dr. Cenac's opinion the treatment plan was reasonable, it was medically possible, morally acceptable, had a reasonable chance of success and was mutually agreed upon.
Dr. Cenac further stated that involuntary commitment of Mr. Bates could have resulted in his becoming less treatable. This result was a probability because during previous hospitalizations Mr. Bates exhibited resistant behavior to the ministrations of the staff. In a hospital environment, Dr. Cenac explained, the psychatrist is the therapist as well as the authoritarian controller of the patient's behavior. This pits the psychiatrist and the resistant patient against each other in a power struggle. If the power struggle is resolved positively, the patient benefits. If negatively, then the patient remains resistant throughout his hospitalization. He cannot be hospitalized forever. Further, the patient's history revealed that subsequent to enforced hospitalization he failed to cooperate with his treatment plan (missed follow-up psychiatric appointments and discontinued his medication) and suffered recurrent suicidal ideation. Dr. Cenac stated that, "[H]ospitalization is no guarantee of suicide prevention. There is only one method of suicide prevention, and that is close visual contact. People have committed suicide inside hospitals."
Dr. Dudley Stewart, accepted by the court as an expert in psychiatry, was a member of the Medical Review Panel. He testified that after Mrs. Bates expressed her concern that her son was self-destructive it was standard procedure to confer with the patient. The best evidence is generally available from the patient, provided that the patient's mental status has been evaluated (he is not psychotic, not under the influence of drugs or alcohol, is coherent, rational, etc.). He stated that a psychiatrist is not an effective lie detector but must make evaluations and exercise clinical judgment on the basis of his experience or knowledge of the individual involved. According to Dr. Stewart, the criteria for involuntary hospitalization is whether the patient is suicidal, homicidal or gravely disabled. The patient denied suicidal ideation and in the psychiatrist's judgment was not acutely suicidal, nor was he neither homicidal or gravely disabled thus the least restrictive reasonable treatment plan should have been employed. To have the patient sent home under the care of his family to return to Dr. Denney in the morning was more than reasonable because potentially suicidal patients who are not acutely suicidal are often treated outside the hospital. They are not always hospitalized.
The jury had the opportunity to observe the witnesses, listen to their testimony, (including the conflicting testimony of the expert witnesses) and to assess their credibility. In arriving at a unanimous verdict in favor of defendants, the jury obviously resolved the conflicting testimony in favor of defendants. Such findings will not be set aside unless clearly erroneous. Anthony v. Hospital Service District No. 1, 477 So.2d 1180 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986). After careful review of the record we find no manifest error therein. Accordingly, the judgment *304 of the trial court rendered in conformity with the verdict is affirmed. Costs of this appeal are assessed against appellant.
AFFIRMED.