760 So.2d 1220 (2000)
Daniela IRION and Fanel Irion, as Natural Tutrix for His Minor Daughter, Raluca Irion
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT and the Ascension Parish Police Jury.
No. 98 CA 2616.
Court of Appeal of Louisiana, First Circuit.
May 12, 2000.
Rehearing Denied July 7, 2000.
*1223 Victor L. Marcello, Gonzales, for Plaintiffs-Appellees Daniela Irion, et al.
Henry D. Salassi, Jr., Keith C. Armstrong, Special Assistant Attorneys General, Baton Rouge, for Defendants-Appellants State of Louisiana, et al.
Before: LeBLANC, FOIL, FITZSIMMONS, and PETTIGREW, JJ., and KLINE,[1] J. Pro Tem.
PETTIGREW, J.
In this case, the defendant appeals from a trial court judgment in favor of the plaintiffs, wherein the trial court found the defendant to be 70 percent at fault in causing the automobile accident that resulted in personal injuries to the plaintiffs. The trial court awarded plaintiffs $3,125,520.30 in damages. For the reasons that follow, we amend, and affirm as amended.

FACTS AND PROCEDURAL HISTORY
On May 18, 1992, plaintiff, Fanel Irion, was operating his 1985 Ford Escort in a northerly direction on Roddy Road near its intersection with Louisiana Highway 934 in Ascension Parish. He was accompanied by his wife, Daniela Irion, and his daughter, Raluca Irion, who was almost five-years old at the time. While Mr. Irion was not familiar with this intersection, he admitted that he had previously proceeded through the intersection earlier that same *1224 day. The record indicates that at the time of this incident, the intersection of Roddy Road and Highway 934 was controlled by stop signs facing the traffic traveling on Roddy Road. As Mr. Irion approached this intersection, he brought his car to a stop, and looked to the left and then to the right. Mr. Irion noticed a vehicle ("the Bolling vehicle") approaching from the right on Highway 934. The Bolling vehicle had its left turn signal on and slowed to a stop. According to Mr. Irion, he assumed the Bolling vehicle was yielding to him so that he could proceed through the intersection. As Mr. Irion attempted to cross the intersection and continue north on Roddy Road, he was struck from the left by a black pick-up truck owned by Patrick Rodriguez and driven by Mark Richard. There was conflicting testimony as to whether Mr. Irion looked back to his left before proceeding through the intersection.
As a result of this accident, the plaintiffs suffered bodily injuries and subsequently filed suit for damages, naming as defendants the State of Louisiana, through the Department of Transportation and Development ("DOTD"), and the Ascension Parish Police Jury. The plaintiffs alleged that the intersection of Roddy Road and Highway 934 was "unreasonably dangerous and defective" and that DOTD was strictly liable to the plaintiffs pursuant to La. Civ. Code art. 2317. In the alternative, plaintiffs argued that pursuant to La. R.S. 9:2800, DOTD "had actual or constructive notice of the vices or defects in the roadways under their custody" and were negligent in the maintenance of the intersection in question.
Prior to the trial of this matter, the Ascension Parish Police Jury was dismissed with prejudice after reaching a settlement with the plaintiffs. The plaintiffs' case against DOTD proceeded to a bench trial on November 26, 1996, before Judge Glynn Long. However, prior to the conclusion of the trial, Judge Long's term expired and the matter was transferred to Judge Pegram J. Mire, Jr. The trial was concluded on October 1, 1997, and Judge Mire took the matter under advisement. On August 27, 1998, Judge Mire rendered judgment in favor of the plaintiffs in the amount of $4,465,029.00. Judge Mire assessed Mr. Irion with 30 percent comparative fault, thus resulting in a final judgment in favor of the plaintiffs in the amount of $3,125,520.30.
It is from this judgment that DOTD appeals, assigning the following specifications of error.
1. The trial court committed legal error in ruling that accident reports, an Ascension Parish Police Jury Resolutions and testimony regarding the reports were admissible at trial.
2. The trial court committed manifest error in finding DOTD liable under LSA-R.S. 9:2800.
3. The trial court abused its discretion in apportioning fault.
4. The trial court abused its discretion in the award of damages.

EVIDENTIARY ISSUES
DOTD argues that the trial court erred in admitting certain documentary evidence into the record. DOTD maintains that this improper evidentiary ruling was one of legal error, thus requiring a de novo review by this court. In support of this argument, DOTD relies heavily on the Louisiana Supreme Court's decision in Reichert v. State, Department of Transportation and Development, 96-1419 (La.5/20/97), 694 So.2d 193. Having reviewed the record in this case in light of Reichert and the more recent case of Palacios v. Louisiana and Delta Railroad Inc., 98-2932 (La.7/2/99), 740 So.2d 95, we conclude that the documents at issue were properly admitted into the record by the trial court.
When the trial of this matter began on November 26, 1996, Judge Long allowed the plaintiffs to introduce into evidence prior accident reports from the intersection *1225 in question and an "accident history listing." DOTD objected on the basis of relevancy and the statutory immunity privilege of 23 U.S.C. § 409. Prior to the second day of the trial of this matter, DOTD filed a motion in limine with Judge Mire requesting that Judge Mire reconsider the prior evidentiary rulings by Judge Long. Judge Mire ruled that the accident history listings were inadmissible, but that the accident reports were going to be allowed into evidence. Judge Mire also admitted into evidence, over the objection of DOTD, an Ascension Parish Police Jury Resolution issued in 1986.
The immunity privilege found in 23 U.S.C. § 409 provides as follows:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented using Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data. (As amended Nov. 28, 1995, P.L. 104-59, Title III, § 323, 109 Stat. 591).
In Reichert, the court addressed the admissibility of certain documents and information in DOTD's possession, recognizing that 23 U.S.C. § 409 was enacted to "[f]oster the free flow of safety-related information by precluding the possibility that such information later would be admissible in civil suits." Reichert, 96-1419 at 4, 694 So.2d at 197 (quoting Perkins v. Ohio Dept. of Transp., 65 Ohio App.3d 487, 584 N.E.2d 794 (1989)). The evidence sought to be introduced by the plaintiff in Reichert included three letters from the DOTD chief engineer to state representatives addressing the placement of a flashing beacon light at the intersection where the accident had occurred, and a DOTD memorandum recommending against the flashing beacon. Reichert, 96-1419 at 2, 694 So.2d at 196. The court held that section 409 "bars discovery and introduction into evidence of all highway safety information collected or compiled by the State [DOTD] for the purpose of obtaining federal funds to enforce safety." Reichert, 96-1419 at 4, 694 So.2d at 197. After analyzing the exhibits with the purpose of section 409 in mind, the court concluded that the exhibits in question were "exactly what section 409 was designed to protect from discovery and admission into evidence." Reichert, 96-1419 at 4-6, 694 So.2d at 198-99.
The Louisiana Supreme Court again addressed this issue in its recent decision in Palacios, supra. In Palacios, the plaintiff sought to discover information from DOTD concerning a particular railroad crossing. DOTD objected to many of the discovery requests, arguing that the information sought was protected by 23 U.S.C. § 409. Citing Reichert, the trial court ruled that the information sought by the plaintiff was protected by the statute. The third circuit reversed, concluding that the statute's privilege may be invoked only when the data at issue is "compiled or collected for the purpose of developing highway safety construction or improvement projects which are either implemented with federal funds or initiated by 23 U.S.C. § 130, 144 or 152." Palacios v. Louisiana and Delta Railroad Inc., 98-258, p. 6 (La.App. 3 Cir. 10/28/98), 721 So.2d 557, 560. The court found there to be insufficient evidence to trigger section 409's immunity privilege and remanded the case to the trial court to allow DOTD an opportunity to present "empirical data" in support of its position that the information was protected by section 409. Palacios, 98-258 at 8, 721 So.2d at 561.
*1226 Thereafter, the Louisiana Supreme Court granted DOTD's writ application and held that there was no requirement that the State prove that the information compiled is linked to a particular federally-funded safety project in order to qualify for the privilege established by section 409. Palacios, 98-2932 at 11-12, 740 So.2d at 101. The court continued:
[T]he information gathered by the state as part of its general examinations of all railroad crossings in the state, in order for the appropriate state and federal administrators to determine which crossings may need improvement and to qualify for federal funding for these improvements, falls within the protective scope of section 409. Thus, we see no error in the trial court's ruling that the data at issue is privileged.
. . . .
Of course, this is not to say that all documents and information in the state's possession will always be privileged under section 409. We conclude only that records amassed pursuant to the federal safety evaluation programs described in 23 U.S.C. Sections 130, 144 or 152, or for the purpose of developing other highway safety improvement projects which may be federally funded, are protected. The plaintiff is at liberty to investigate, examine and present other relevant evidence, so long as such evidence was not compiled or collected for purposes of federal highway improvement programs. Moreover, our ruling does not preclude the testimony of experts, eyewitnesses, or others, so long as that testimony is not based upon privileged documents or information.
Palacios, 98-2932 at 12-13, 740 So.2d at 101-02.
Applying the supreme court's holdings in Reichert and Palacios to the instant case, we conclude that the documents in question are not privileged under section 409. In so holding, we adopt the reasons given by the trial court in its ruling on DOTD's motion in limine regarding the accident reports:
This court, after reading the memorandums of both parties and doing its own research, holds that the accident reports are admissible because these reports were collected and are compiled by the Department of Public Safety and not by the Department of Transportation and Development. These reports were not collected or compiled by the State for the purpose of obtaining federal funds or to enforce safety. Historically, accident reports have been collected by the Department of Public Safety for many other purposes. Collection or compilation of such reports have far outdated the enactment of 23 USCA 409, although the Department of Transportation and Development may have used such accident reports as raw data or information to compile other reports. That fact, in and of itself, does not make the underlying facts inadmissible simply because they are later recorded by the Department of Transportation and Development. Furthermore, if the court were to adopt the interpretation which the State proposes, then no accident report could ever be admitted in any case, regardless of whether or not the State is a party. Clearly, this is not the intent of the statute. The federal statute must be construed restrictively to prohibit only the information that is expressly stated therein.
It is for these same reasons that DOTD is not entitled to assert a section 409 privilege with regard to the Ascension Parish Police Jury Resolution. As correctly noted by plaintiffs in brief, this resolution "is no more than a complaint by an interested party requesting action." The resolution is a public record that was acquired by the plaintiffs from a third party, not DOTD. The documents at issue in this case are not the type of evidence that section 409 is designed to protect from discovery and admission into evidence. Thus, we find no error by the trial court in allowing the *1227 plaintiffs to introduce same into evidence. This assignment of error is without merit.

LIABILITY OF DOTD
DOTD argues that the plaintiffs failed to meet their burden of proving all of the essential elements for their claim. DOTD asserts that "[w]hether damages are sought under a theory of negligence or strict liability, the elements to be proven by a plaintiff before he/she can recover from a government defendant based on a defective condition of a roadway are the same."[1] According to DOTD, a plaintiff must prove that: (1) the defendant owned or had custody of the thing that caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; (3) the defendant had actual or constructive knowledge of the unreasonable risk of harm and failed to take corrective actions within a reasonable time; and (4) the defect was a cause-in-fact of the accident.
DOTD's position is premised on the argument that the distinction between the traditional strict liability action under Article 2317 and the negligence action under Article 2315 against a government owner of a damage-causing thing is effectively eliminated by La. R.S. 9:2800, which adds to the "strict liability" cause of action the requirement that a claimant prove "actual or constructive notice."[2] However, pursuant to the Louisiana Supreme Court's recent decision in Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14, this argument fails.
In Jacobs, the supreme court concluded that prior to the enactment of 1995 La. Acts Nos. 1328 and 828, La. R.S. 9:2800 was an impermissible legislative act limiting the State's liability in direct conflict with the unequivocal waiver of sovereign immunity found in La. Const. art. XII, § 10(A).[3] Thus, La. R.S. 9:2800 was unconstitutional until November 23, 1995, the effective date of these acts. Further, the court noted that because the law was substantive in nature, it could not be applied retroactively to cases that arose prior to its effective date. Jacobs, 98-2510 at 12, 737 So.2d at 23.
The accident in the instant case was on May 18, 1992, prior to the effective date of La. Acts 1995, Nos. 1328 and 828. *1228 Therefore, pursuant to the supreme court's holding in Jacobs, the plaintiffs in this case were only required to prove the traditional elements of strict liability under Article 2317.[4]
The parties do not dispute the fact that DOTD maintained custody and/or control over the intersection of the Roddy Road and Highway 934. However, DOTD asserts that because the trees that allegedly caused the sight obstruction were in fact on private property and not within DOTD's right-of-way, DOTD could not be held liable for same.
It is well settled that DOTD owes a duty to insure that highways are reasonably safe for persons exercising ordinary care and reasonable prudence. Graves v. Page, 96-2201, p. 12 (La.11/7/97), 703 So.2d 566, 572. This includes the duty to look for situations where a condition off of the right-of-way may endanger the safety of motorists. Wilson v. State, Through Department of Highways, 364 So.2d 1313, 1316 (La.App. 3 Cir.1978), writ denied, 366 So.2d 563 (La.1979). In Wilson, the court outlined the duty of DOTD in such situations, stating:
[T]he duty of the Department of Highways to maintain its highways in a reasonably safe condition for the safety of the traveling public is so great that where a situation of imminent danger is posed to the users of the highway because of a tree or other hazardous instrumentality situated on private property along the highway right-of-way, the Department cannot sit back and ignore the dangers posed because the danger-causing object is situated on private property.
Wilson, 364 So.2d at 1316.
In Rivere v. Union Pacific Railroad Company, 93-1132, p. 12 (La.App. 1 Cir. 10/7/94), 647 So.2d 1140, 1148, writ denied, 95-0292 (La.3/24/95), 651 So.2d 295, this court addressed the same issue, concluding that the Parish of Iberville was liable for damages to the plaintiff "[a]lthough the sight obstructions which hindered the plaintiff's view of the train were not located within the parish right-of-way." We noted that the "Parish's responsibility extends beyond passive acceptance of a dangerous situation and requires affirmative action such as erecting additional warning signs, erecting a stop sign, clearing the sight obstructions, or closing the crossing." Id.
According to the testimony of Thomas J. Buckley, who was a traffic operations engineer for DOTD at the time of the accident in question, DOTD was performing pre-scheduling inspections of the roadways in Ascension Parish in accordance with the Maintenance Planning Manual. These inspections were done approximately once every two weeks by the parish maintenance superintendent to detect "things that needed correcting." Mr. Buckley indicated that this included everything from potholes that needed repair to trees that needed trimming. Further, Mr. Buckley acknowledged that prior to the date of this accident, there were trees in the southwestern quadrant of the intersection that had the potential to obstruct vision depending on where a vehicle was situated in the intersection in relation to the stop sign.
Thus, DOTD cannot escape liability by arguing that it had no control over the trees in question. DOTD, by virtue of the testimony of its own witnesses, knew that the trees were there, and further, that they presented a possible hazardous condition for drivers attempting to cross the intersection. DOTD was required to take "affirmative action" to "ameliorate the hazardous condition." Rivere, supra.
The next question we must address is whether the intersection created an unreasonable risk of harm. Whether a *1229 condition of a highway is dangerous and hazardous to an ordinary and prudent driver is a factual determination. Simpson v. State, Department of Transportation and Development, 636 So.2d 608, 611 (La.App. 1 Cir.1993), writ denied, 94-0042, 94-0047, 94-1005 (La.5/6/94), 637 So.2d 471, 472. The reviewing court should consider the frequency of accidents at the place in the highway, the physical aspects of the roadway, and the testimony of expert witnesses in arriving at this factual determination. Turner v. State, Department of Transportation and Development, 509 So.2d 489, 491 (La.App. 3 Cir.), writ denied, 510 So.2d 377 (La.1987).
For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Thus, the reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Finding that the intersection in question "constituted a hazardous condition," the trial court stated:
Trees located in the southwest quadrant of the intersection obstructed the view of motorists stopped at the South side of the intersection and prevented vehicles approaching the intersection from the West from being seen. This factor, combined with the fact that obstructed traffic was not required to stop, created the hazardous condition. The expert testimony has been taken into consideration and this court finds that the testimony of both the plaintiff and the defendant's witnesses established that the intersection constituted an unreasonable risk to motorists attempting to negotiate it from the South traveling North on Roddy Road. Likewise, the sight obstruction to those traveling east on La. 934 created an unreasonable risk of harm. Finally, the record contains ample evidence concerning the accident history at this intersection. In the four years preceding, there was a total of forty-two (42) accidents at the intersection, twenty-five (25) of which were right angle collisions.
Having reviewed the record in its entirety, we are satisfied that the evidence before the trial court was sufficient in that it furnished a reasonable factual basis for the trial court's findings. Thus, the trial court's determination that the intersection in question created an unreasonable risk of harm was not clearly erroneous.
The final element of a traditional strict liability claim is causation. A trial court's finding regarding causation is a factual finding and must be reviewed under the manifest error standard of review. Robling v. Allstate Insurance Company, 97-0582, p. 4 (La.App. 1 Cir. 4/8/98), 711 So.2d 780, 783. In cases where there may be several causes-in-fact for a single accident, the Louisiana courts have applied the "substantial factor" test to determine causation. Graves, 96-2201 at 8, 703 So.2d at 570. As noted by the supreme court in the landmark decision of Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 482, 137 So.2d 298, 302 (1962), "[n]egligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm.... the negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it."
With regard to the issue of causation, the trial court found as follows:
If there had been no sight obstruction present at the intersection of Roddy *1230 Road and La. 934, Mr. Irion would have seen the black pick-up proceeding East on La. 934. Furthermore, had the intersection been a four-way stop, the presence of the sight obstruction would be irrelevant as the Rodriguez vehicle would have been required to stop at the intersection and yield to Mr. Irion who was obviously stopped at the intersection first. It is the opinion of this Court that the dangerous condition of the intersection was the cause of the accident.
We have reviewed the record in its entirety, including the testimony of Mr. Irion regarding his action just prior to the accident, and are convinced that this was an accident with multiple causes. Mr. Irion was negligent in entering into the intersection without insuring that the way was clear and it was safe for him to proceed. Mr. Irion's actions were certainly a "substantial factor" in bringing about the harm suffered by himself and his family. However, Mr. Irion's actions alone were not the only cause-in-fact of this accident. There was sufficient evidence presented to the court to support its conclusion that the condition of the intersection was also a cause-in-fact of the accident. The sight obstruction, as testified to by both plaintiff's expert and DOTD's expert, and the fact that DOTD did nothing to correct the obvious hazardous condition of the intersection were both "substantial factors" in causing the accident.

ALLOCATION OF FAULT
In its third assignment of error, DOTD argues that the trial court abused its discretion in assessing 70 percent fault to DOTD and only 30 percent fault to Mr. Irion. DOTD maintains that "had Mr. Irion only followed Louisiana traffic laws and operated his vehicle as a reasonably safe individual exercising ordinary care and reasonable prudence, the accident would have been avoided." Based on the evidence in the record, DOTD concludes that the trial court should have allocated 100 percent of the fault to Mr. Irion.
It is well settled that the allocation of fault is a factual finding within the sound discretion of the trier of fact and is subject to the manifest error standard of review. Haydel v. Hercules Transport, Inc., 94-1246, p. 19 (La.App. 1 Cir. 4/7/95), 654 So.2d 418, 430, writ denied, 95-1172 (La.6/23/95), 656 So.2d 1019. We have thoroughly reviewed the record in the instant case and conclude that the trial court was clearly wrong in determining that Mr. Irion was only 30 percent at fault in causing the accident in question.
An individual driver owes a duty of being reasonably observant of conditions that might affect the operation or use of his vehicle that would pose an unreasonable risk of harm to others. This duty includes the duty to use his automobile reasonably and to maintain a proper lookout for hazards which might pose an unreasonable risk of harm. Faulkner v. State, Department of Transportation & Development, 25,857, p. 10 (La.App. 2 Cir. 10/26/94), 645 So.2d 268, 275-76, writ denied, 94-2901, 94-2908 (La.1/27/95), 649 So.2d 390.
Mr. Irion was attempting to proceed across a favored thoroughfare, Louisiana Highway 934, from an inferior road, Roddy Road. Traffic flow at this intersection was regulated by a stop sign on Roddy Road. Therefore, Mr. Irion was bound by La. R.S. 32:123 B, which provides, in part:
[E]very driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the cross walk on the near side at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard.
*1231 When a motorist is confronted with a stop sign at an intersection, it is her duty to come to a complete stop, to appraise traffic and to make certain that the way is clear before proceeding. To merely stop before entering a right-of-way street is to perform only half of the required duty. Holt v. State, Department of Transportation and Development, 28,183, p. 10 (La.App. 2 Cir. 4/3/96), 671 So.2d 1164, 1171, writ denied 96-1132 (La.6/21/96), 675 So.2d 1080.[5]
According to Mr. Irion, as he approached the intersection of Roddy Road and Highway 934, he came to a complete stop, looked to the left, and then looked to the right. When asked what he observed when he looked to the left, Mr. Irion responded, "A lot of trees and [a] black spot between [the] trees." Mr. Irion maintained that he could not see any further than approximately 60 feet to the left on Highway 934. Regarding what he saw to the right, Mr. Irion indicated that he saw a white car approaching with its left turn signal on. Mr. Irion then noticed that the white car's turn signal stopped flashing, and he assumed it was because the driver of the white vehicle was going to allow him to proceed through the intersection. Mr. Irion stated, "I saw that blinker turned off and that made me think it was probably for the stop sign and I could proceed." Based on this statement and the totality of Mr. Irion's testimony, it is apparent that he was of the belief that the intersection was controlled by a four-way stop sign. Therefore, without looking back to the left, he attempted to cross the intersection and was struck from the left by a black pick-up truck.
Also testifying regarding the events leading up to the accident in question was Daniela Irion, who was in the front passenger seat of the Irion vehicle at the time of the accident. Ms. Irion indicated that when looking to the left at the intersection, their view was obstructed by branches from a tree that "were laying over the road." Ms. Irion further testified that she and her husband had looked back to the left before proceeding through the intersection.
Based on this testimony by Mr. Irion and his wife, it is unclear exactly what he did before proceeding through this intersection. However, what is clear is that Mr. Irion was on an inferior road and was confronted with a stop sign at the intersection. Pursuant to La. R.S. 32:123 B and the case law cited above, Mr. Irion had an affirmative duty to determine whether there was any approaching traffic that was so close as to constitute an immediate danger. Mr. Irion failed to do so, and this unfortunate accident followed.
Having determined that the trial court's allocation of 70 percent fault to DOTD and 30 percent to Mr. Irion was against the weight of the evidence and clearly wrong, we will adjust the fault allocation, "but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96), 666 So.2d 607, 611. In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the Louisiana Supreme Court set forth guidelines for apportioning fault under the doctrine of comparative negligence. The Watson court adopted section 2(b) of the Uniform Comparative Fault Act which states, "In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." The court then set forth several factors that may influence the respective degrees of fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted *1232 from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Watson, 469 So.2d at 974.
After reviewing and evaluating the record, and weighing the factors set forth in Watson to assess the nature of the conduct of each party, we agree with the trial court that both DOTD and Mr. Irion must share in the responsibility for this accident and the resulting injuries to Mr. Irion and his family. However, based on the evidence in the record, we believe that the trial court was in error in assessing only 30 percent of the fault to Mr. Irion. We are satisfied that the highest amount of fault that a reasonable factfinder could have assessed to DOTD was 50 percent. Accordingly, we apportion fault equally between DOTD and Mr. Irion. The judgment of the trial court is amended to reflect the above apportionment of fault; i.e., 50 percent of the fault to DOTD, and 50 percent of the fault to Mr. Irion.

DAMAGES
We now turn to DOTD's argument that the damages awarded by the trial court were excessive based on the evidence in the record. As previously indicated, the trial court awarded the plaintiffs $3,125,520.30 in damages. This figure represents the total damages awarded to each of the plaintiffs, less 30 percent for the comparative fault allocated to Mr. Irion. The trial court awarded damages as follows:

Raluca Irion
 Life Care Plan $2,500,604.00
 Lost Earning Capacity $ 448,387.00
 General Damages $1,000,000.00
 Past Medical Expenses $ 166,038.00
 Total Award for Raluca $4,115,029.00
Fanel Irion
 Pain and Suffering $ 2,000.00
 Mental Anguish $ 20,000.00
 Loss of Consortium $ 150,000.00
 Total Award for Fanel $ 172,000.00
Daniela Irion
 Pain and Suffering $ 8,000.00
 Mental Anguish $ 20,000.00
 Loss of Consortium $ 150,000.00
 Total Award for Daniela $ 178,000.00

It is well settled that the trier of fact has much discretion in awarding damages. La. C.C. art. 2324.1. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The appellate court's first inquiry should be "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Youn, 623 So.2d at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn, 623 So.2d at 1261.
In their brief to this court, the plaintiffs provided the court with a complete overview of Raluca's injuries and subsequent treatment that she underwent in connection therewith. According to Raluca's initial treating physician, Dr. Thomas P. Perone, Raluca had suffered "a severe closed head injury with a linear skull fracture." Dr. Perone indicated that four days after her admission to Our Lady of the Lake Regional Medical Center, Raluca's injuries had progressed such that he "actually thought she was brain dead." Dr. Perone further noted, "[t]his is one of the few patients I have had who have *1233 survived actually [sic] this severe of a head injury." A discharge summary dated June 1, 1992, from Our Lady of the Lake Regional Medical Center provides as follows:
FINAL DIAGNOSIS: 1) Severe closed head injury with increased intracranial pressure and bilateral cerebral infarctions. 2) Multiple abrasions. 3) Central hyperthermia. 4) Diabetes insipidus, resolved. 5) Escherichia coli urinary tract infection, treated. 6) Respiratory insufficiency secondary to diagnosis No. 1. PROCEDURE: 1) Intracranial pressure monitor insertion on 5-18-92. 2) Left radial artery arterial line insertion on 5-19-92. 3) Right subclavian central line and tracheostomy performed on 5-29-92.
Raluca was subsequently transferred to Children's Hospital in New Orleans and remained there for two and a half months for rehabilitation. Regarding Raluca's condition at that time, Dr. Perone testified as follows:
By the time she transferred, she would open her eyes, but she really was not aware of things. She would not focus on someone and be able to actually follow them around the room. Just the fact that she was opening her eyes was a significant improvement for her, considering the way she had been.
Dr. Joseph Nadell, a pediatric neurosurgeon, was one of Raluca's treating physicians at Children's Hospital. Dr. Nadell indicated that at the time of her discharge, Raluca was still having problems with "the higher level gross motor functions ... walking a balance beam, hopping, skipping, jumping, running up and down stairs, things like that." She also had deficits in her fine motor skills, "mainly in the higher levels of coordination." Raluca was favoring her right side and had to be reminded to use her left hand. Her IQ testing revealed that Raluca was mildly, mentally retarded. Raluca had central auditory processing difficulties and continued to have problems with memory and attention. Her language was classified as mild to moderate impairment.
When Raluca was discharged from Children's Hospital, she had to wear a helmet to protect her skull. She also had to wear a boot on her left foot and a brace around her knee, and had to be held by the hand to walk because she had no balance. Raluca wore the helmet and the brace for one year and, according to her mother, was teased by the other children at school because of this.
Medical records from Baton Rouge General Medical Center indicate that Raluca underwent several surgical procedures in June of 1994, including a cranioplasty, duraplasty, and excision of multiscar deformities. Following these procedures, Raluca began experiencing focal seizures and had to take seizure medication for one month.
Raluca returned to Children's Hospital on May 17, 1996, for a three-day evaluation. After this final evaluation, Dr. Nadell's final diagnosis was as follows:
Well, she's had a traumatic brain injury with resultant maturic problems, basically a left hemiparesis that has improved, but she still has residual dysfunction that impairs her higher motor abilities, some of the ambulating skills and fine motor skills with her upper extremity.
She has higher cognitive deficits in language comprehension, but more in expression and in memory skills; and she also has, from what is reported by her therapist, deficits in frontal lobe function which has to do with attention, distractibility, things like that, safety issues.
So she has a traumatic brain injury that involves multiple areas of both sides of the brain.
. . . .
... I think at this point in time these are probably permanent residuals.
I think she's always going to have deficits. The degree may improve some, but I think thatas I say, I mentioned *1234 earlier about recovery of function, the majority of recoverythe most rapid recovery is the first six months and the majority thereafter is by 18 months.
. . . .
... I think the language problems arethe difficulty with language, memory, and then I think some of the frontal lobe dysfunction are permanent.
In addition to the extensive medical evidence in the record, the trial court also had the benefit of expert testimony concerning life care plans prepared for Raluca, based on the injuries she sustained in this accident. A review of this testimony reveals that the two experts had considerably different views regarding Raluca's need for future medical and rehabilitation care. As indicated by the trial court in its reasons for judgment, the court considered the testimony of both experts in reaching its decision.
Raluca's parents, who were also injured in the accident in question, sustained only minor injuries in comparison to Raluca. Mr. Irion suffered from a laceration on his arm that required stitches. Ms. Irion sustained two broken ribs and a bruise to the left side of her waist.
According to Mr. Irion's testimony, he went to the aid of his daughter immediately after the accident. She had been thrown from the vehicle and was bleeding from her head and mouth. Mr. Irion "stuck two fingers in her mouth" to help her breathe and "flipped her on her side" to prevent her from choking on her own blood. Ms. Irion, while not able to immediately assist her daughter, watched as her husband attempted to help Raluca, who was laying in the roadway having seizures.
Raluca's parents both testified about the course of treatment that Raluca underwent following the accident. Raluca was rushed to Our Lady of the Lake Regional Medical Center in a helicopter. According to Ms. Irion, the doctors there "never had hope." In fact, the doctors told them that Raluca probably would not make it through the night. Further, a few days after the accident, the doctors approached Raluca's parents "with some papers to stop the life support and donate [Raluca's] organs."
Based on our review of the evidence contained in the record, we find no abuse of discretion by the trial court in the damages awarded. While the damage awards in this case may be on the high side, they are not so high as to constitute an abuse of the trial court's vast discretion. Given the "particular injuries and their effects under the particular circumstances" on the plaintiffs, the trial court's damage awards are not beyond that which a reasonable trier of fact could assess. See Youn, 623 So.2d at 1260. However, based on our reallocation of fault as previously discussed, the damages awarded to each of the plaintiffs will be reduced by 50 percent. Thus, the trial court's judgment is amended to reflect a total award to the plaintiffs in the amount of $2,232,514.50.

DECREE
For the above and foregoing reasons, the judgment of the trial court allocating 70 percent fault to DOTD and 30 percent fault to Mr. Irion is amended to reflect the following reallocation of fault: 50 percent fault to DOTD and 50 percent to Mr. Irion. The judgment is further amended to reflect a total award to the plaintiffs in the amount of $2,232,514.50, together with legal interest from the date of judicial demand until paid. In all other respects, the trial court's judgment is affirmed. Court costs in the amount of $3,441.28 are assessed against DOTD, and appeal costs in the amount of $2,845.67 are assessed equally between the plaintiffs and DOTD.
AMENDED, AND AS AMENDED, AFFIRMED.
KLINE, J. Pro Tern., concurs and assigns reasons.
LeBLANC, J., dissents and assigns reasons.
FOIL, J., dissents for the reasons set forth by LeBLANC, J.
*1235 KLINE, J. Pro Tem., Concurring.
I believe that Mr. Irion was predominantly at fault in the accident; thus, I believe that Mr. Irion should have been assessed a much greater percentage of fault than fifty percent. However, under the standard enunciated by the Louisiana Supreme Court in Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96), 666 So.2d 607, 611, once this court found that an allocation of only thirty percent fault to Mr. Irion was clearly wrong, we could only raise the percentage of Mr. Irion's fault to the lowest percentage of fault that was reasonably within the trial court's discretion. For this reason, I concur in the majority's imposition of only fifty percent fault to Mr. Irion.
LeBLANC, J. (dissenting).
Bad drivers do not make bad intersections.
In Ferrell v. Fireman's Fund, 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747, the supreme court instructs courts of appeal that when legal error interdicts the fact-finding process, the appellate court should make its own independent de novo review to determine a preponderance of the evidence and enter whatever judgment is appropriate in the case.
I would find that the district court committed legal error when 42 accident reports, purportedly the "accident history" of the intersection, were admitted into evidence and relied on by the court to hold the intersection hazardous. There is no evidence that the accident reports relied on by the district court were relevant to the accident at issue. Although the district court stated 25 were right angle collisions, my review reveals only 5 (within a four-year period) were of northbound Roddy Road and eastbound Highway 934 vehicles. The accident history of an intersection that is relevant (admissible) is the history of similar accidents at the intersection, not any and all accidents in the area. Bates v. Denney, 563 So.2d 298, 300 (La. App. 1 Cir.), writ denied, 566 So.2d 961 (1990). Accordingly, I would find the admission of the accident history of the intersection was legal error and would review de novo the entire record.
DOTD cannot be held responsible for all injuries on the state's highways that result from careless driving. Moreover, not every imperfection or irregularity will give rise to liability, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. See, e.g., Simeon v. Doe, 618 So.2d 848 (La.1993).
DOTD vigorously disputes whether the intersection was hazardous and whether the intersection was a cause-in-fact of the plaintiffs' injuries. After my reading of the record and review of the evidence in this matter, I would conclude that the lower court erred in finding the intersection constituted a hazardous condition. The evidence and testimony establish that east-bound Roddy Road traffic, after stopping for the stop sign in a position of safety short of the edge of the roadway of Highway 934, has an unobstructed westerly view for 600 feet. If Mr. Irion had safely operated his vehicle and exercised ordinary care, this accident could have been avoided.
Moreover, I find that the record evidence clearly establishes that the sole legal cause of this accident was Mr. Irion's negligent operation of his vehicle. Louisiana law provides the applicable rules for motorists after stopping at a stop sign. The driver of a vehicle approaching an intersection marked by a stop sign has the duty to stop:
at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles *1236 which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard.
La. R.S. 32:123(B). A motorist stopped in obedience to a stop sign at an intersection has the additional duty to carefully evaluate the traffic conditions in the intersection. Plaintiffs' duty, prior to traversing the intersection, entailed stopping completely at the stop sign, examining oncoming traffic, and determining whether he could safely travel through the intersection. See Conerly v. South Cent. Bell Telephone Co., 557 So.2d 1041, 1043 (La.App. 4 Cir.), writ denied, 559 So.2d 1368 (1990).
In Valenti v. Courtney, 206 So.2d 579, 581 (La.App. 1 Cir.1968), the defendant motorist stopped at a stop sign located twelve feet from the intersection, at which point her vision was partially blocked by a growth of trees. She failed to move her automobile closer to the intersection to better see oncoming traffic, but proceeded into the intersection and collided with another vehicle. We held the defendant driver negligent. Even if, after stopping at the stop sign, Mr. Irion's vision was partially blocked, his duty was to inch or creep forward until he could see oncoming traffic; not blindly proceed into the intersection.
Moreover, Mr. Irion's testified that after approaching the intersection and stopping, he looked once to the left and observed a "black spot" between the trees. He then looked to the right and saw a white car, with a blinking turn signal indicating a turn; then the blinking stopped. Mr. Irion stated he thought the white car turned off the turn signal "probably for the stop sign and I could proceed" and that the white car was "letting me pass". Mr. Irion testified he did not remember looking back to the left a second time, but that he proceeded out into the intersection.
Mr. Irion failed to correctly evaluate the traffic control devices in the area and the oncoming traffic. His failure should not be held to be "inadvertent"; rather, it was the legal cause of this tragic accident. Even if the admission of the accident history was not legal error, I would still find the district court was manifestly wrong. I would then find that plaintiff driver was 100 per cent at fault. Therefore, I respectfully dissent.
NOTES
[1] Judge William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[1] In a negligence action under La. Civ.Code art. 2315 against the owner of a damage-causing thing the claimant must prove that 1) something about the thing created an unreasonable risk of injury; 2) which resulted in the damage; 3) the owner knew or should have known of that risk; and, 4) the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 (La.1982). By contrast, in a strict liability action under La. Civ.Code art. 2317 against the owner of a damage-causing thing, the claimant must prove only three of the four elements of negligence, as he is relieved of proving that the owner "knew or should have known" of the risk involved. Id.
[2] The limitation of liability for public bodies is provided for in La. R.S. 9:2800 as follows:

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.
[3] Section 10(A) provides that "[n]either the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property." 1995 La. Acts No. 1328 proposed a constitutional amendment to La. Const. art. XII, § 10(C) allowing the legislature to limit the liability of the State. In 1995 La. Acts No. 828, the legislature reenacted La. R.S. 9:2800 without change, thus providing the necessary supplemental legislation for Section 10(C) to carry its edict into effect.
[4] We note that even if La. R.S. 9:2800 did apply to the instant case, DOTD would still be liable to the plaintiffs. The plaintiffs proved that DOTD had "actual or constructive notice" of the defect at the intersection in question.
[5] The State of Louisiana's writ application was granted, 96-1074 (La.6/21/96), 675 So.2d 1093, but the case was settled prior to submission.