PARRO, J.
Lin this medical malpractice case, St. Tammany Parish Hospital, Service District No. 1 (STPH), Keva Fontanille, R.N., and the Louisiana Patient’s Compensation Fund (LPCF)[1] appeal a judgment in favor of Heather and Jeremy Aymami, individually and on behalf of their minor children, Logan and Savanna Aymami, for damages they incurred as the result of injuries Heather suffered in a fall at the hospital. The Aymamis answered the appeal, seeking additional damages. For the following reasons, we affirm the judgment.
FACTUAL AND PROCEDURAL BACKGROUND
Heather Aymami was admitted to the labor and delivery unit at STPH at 12:02 a.m. on February 14, 2002. Epidural anesthesia was begun at 8:15 a.m. and continued until she delivered her son, Logan, at 11:20 a.m.[2] Keva Fontanille, R.N., was Heather’s labor and delivery nurse, and she continued caring for Heather after the birth. Heather experienced numbness and tingling in her legs as the epidural anesthetic wore off, but by 2:45 p.m., these sensations had stopped. About that time, Keva suggested that Heather might enjoy a bath in the room’s whirlpool tub. Keva *444 lowered the bed rail in order to remove Heather’s IV and Foley catheter and to make it possible for Heather to get out of bed and take a bath. Keva then went to the bathroom to start the bathwater and empty the catheter bag. While the bathtub was filling and Keva was emptying the catheter bag in the bathroom, Heather appeared in the bathroom doorway. She had left the bed and walked several steps to the bathroom with her mother at her side, holding her arm. Keva looked up and saw Heather in the doorway, made a brief comment to her, and turned back to finish emptying the catheter bag. Within a few seconds, Heather tried to take one more step and fell, breaking her left leg.[3] She suffered severe comminuted displaced left tibia and fibula shaft fractures, which | ^required surgical correction with rods and pins later that evening. A second surgical procedure was performed about a year later to remove scar tissue.
The Aymamis filed a complaint with the Division of Administration, Patient’s Compensation Fund Oversight Board, seeking review by a medical review panel to determine whether Keva’s conduct breached the standard of care and caused Heather’s injuries. The panel found that Keva’s conduct met the applicable standard of care. On June 13, 2005, the Aymamis filed suit against Keva and STPH, alleging that the direct and proximate cause of Heather’s injuries was the substandard care received by her while at STPH in Keva’s care. The petition stated that Keva encouraged Heather’s premature ambulation, but she took no safeguards to test Heather for reactivity and failed to follow hospital protocol for post-surgery ambulation and assessment for risk of falling. The Aymamis sought damages for Heather’s pain and suffering, mental anguish, permanent disability, loss of quality of life, medical expenses, and loss of income, as well as loss of consortium damages for her husband and children. The defendants answered, denying the allegations, and extensive discovery took place over a number of years.
The case went to a bench trial on April 12, 2012. Following two days of testimony and the introduction of numerous exhibits, including the depositions of expert and lay witnesses, the court took the case under advisement. On September 17, 2012, the court provided written reasons, concluding that Keva had breached the standard of care in several particulars and was liable, along with STPH under the doctrine of respondeat superior, for the injuries sustained by Heather and the damages that resulted. The court found no fault on the part of Heather. The court awarded Heather general damages in the amount of $100,000, medical expenses in the amount of $39,303.58, and lost wages in the amount of $29,300. For loss of consortium, the court awarded Jeremy and each of the two children $5,000. A judgment awarding these amounts, plus court costs and legal interest from the date the complaint was filed with the Patient Compensation Fund Oversight Board, was signed October 18, 2012. This appeal followed.
| «ASSIGNMENTS OF ERROR
STPH and Keva submit the following assignments of error:
1. The trial court erred as a matter of law in accepting the testimony of Dr. Jay Turkewitz in support of the contention that “the patient bears no responsibility for their safety at all in a hospital facility,” which resulted in the application of incorrect prinei- *445 pies of law, thereby depriving STPH and Nurse Fontanille of substantial jurisprudential rights and limitations of liability.
2. The trial court erred in determining that the actions of Keva Fontanille, R.N., in the hours following the birth of Ms. Aymami’s child, violated the applicable standard of care.
3. Alternatively, it was reversible error for the trial court to conclude that any breach by STPH or its employee, Keva Fontanille, R.N., was the cause in fact of any injuries and damages sustained by the plaintiffs.
4. In the further alternative, the trial court erred in failing to allocate any degree of fault to the plaintiff, Heather Aymami, for her failure to follow Nurse Fontanille’s specific instructions.
LPCF submits the following assignments of error:
1. The trial court committed legal error by: (a) failing to reconcile the factual evidence regarding the circumstances leading up to Plaintiffs fall; (b) finding the hospital was the guarantor of the patient’s safety, regardless of the facts; and (c) failing to determine if any conduct on the part of the Defendants caused Plaintiffs injuries.
2. The trial court was wrong in finding the hospital was the guarantor of the patient’s safety and the Defendants’ actions caused the Plaintiffs injuries considering a reconciliation of the facts shows the Plaintiff was clearly advised to wait for assistance and she refused to do so, which was the sole cause of the fall.
3. Assuming the de novo standard of review does not apply, the lower court committed manifest error in finding Defendants liable considering the court ignored crucial testimony in the Defendants’ favor and relied on Plaintiffs’ experts who were either unqualified or whose testimony was inconsistent and implausible.
4. Under either standard of review, the lower court erred in not finding comparative fault on the part of Plaintiff, Heather Aymami.
5. Assuming the lower court’s decision is not reversed on liability or causation, the lost wage claim should be reduced by approximately half of that which was awarded.
The Aymamis answered the appeal and assigned the following as errors:
1. The trial court erred in awarding excessively low general damages for the severe injuries sustained by Heather Aymami.
2. The trial court erred in awarding excessively low loss of consortium awards to Heather Aymami’s husband, Jeremy, and the couple’s minor children.
INAPPLICABLE LAW

Standard of Review

A court of appeal may not overturn a judgment of a trial court unless there is an error of law or a factual finding that is manifestly erroneous or clearly wrong. Morris v. Safeway Ins. Co. of Louisiana, 03-1361 (La.App. 1st Cir.9/17/04), 897 So.2d 616, 617, unit denied,, 04-2572 (La.12/17/04), 888 So.2d 872. The Louisiana Supreme Court has posited a two-part test for the appellate review of facts in order to affirm the factual findings of the trier of fact: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trier of fact; and (2) the appellate *446 court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous). See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trier of fact’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See Stobart v. State, through Dep’t of Tramp, and Dev., 617 So.2d 880, 882 (La.1993); Moss v. State, 07-1686 (La.App. 1st Cir.8/8/08), 993 So.2d 687, 693, writ denied, 08-2166 (La.11/14/08), 996 So.2d 1092. If the trial court’s factual findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse those findings, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Smegal v. Gettys, 10-0648 (La.App. 1st Cir.10/29/10), 48 So.3d 431, 435; LeBlanc v. Appurao, 13-0491 (La.App. 1st Cir.2/13/14), 138 So.3d 1, 5, writ denied. 14-0498 (La.4/17/14), 138 So.3d 632. Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous. Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798, 806.
When a trial court incorrectly applies a principle of law, which causes a substantial deprivation of a party’s rights or materially affects the disposition, it commits a legal error. Hains v. Hains, 09-1337 (La.App. 1st Cir.3/10/10), 36 So.3d 289, 296. Legal errors are prejudicial when they materially affect the outcome and deprive a party 16of substantial rights. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735. When such a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Hains, 36 So.3d at 296.

Medical Malpractice

In a medical malpractice action, the plaintiff must prove by a preponderance of the evidence the applicable standard of care, a violation of that standard of care, and a causal connection between the violation of the standard of care and the claimed injuries. Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228, 1233; see also LSA-R.S. 9:2794(A). Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. Martin v. E. Jefferson Gen. Hosp., 582 So.2d 1272, 1276 (La.1991); Washington v. Waring, 13-0078 (La.App. 1st Cir.2/18/14), 142 So.3d 40.
In addition to proving a breach of the standard of care, a plaintiff must also establish with adequate evidence a causal connection between the substandard care and the plaintiffs injuries. Pfiffner, 643 So.2d at 1230. Louisiana Revised Statute 9:2794(A)(3) requires the plaintiff to prove that, as a “proximate result” of the defendant’s failure to exercise the required degree of care, “the plaintiff suffered injuries that would not otherwise have been incurred.” Washington, 142 So.3d at 45.
Nurses who perform medical services are subject to the same standards of care and liability as physicians. Johnson v. Morehouse Gen. Hosp., 10-0387 (La.5/10/11), 63 So.3d 87, 96. It is well established that a hospital can be liable for the negligence of its employees under the doctrine of respondeat superior. Grimes v. Louisiana Med. Mut. Ins. Co., 09-0292 (La.App. 1st Cir.9/11/09), 29 So.3d 505, *447 508, ajfd as amended, 10-0039 (La.5/28/10), 36 So.3d 215.
Expert testimony is generally required to establish the applicable standard of care and whether that standard of care was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Pfijfner, 643 So.2d at 1233-34. Where there are two permissible views of |7the evidence, the fact-finder’s choice between them cannot be manifestly erroneous. Adams, 983 So.2d at 806. Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Id. at 806-07. Indeed, where the fact-finder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. Id. at 807. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Id. Where expert witnesses present differing testimony, it is the responsibility of the trier of fact to determine which evidence is the most credible. Washington, 142 So.3d at 46.
A trial court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. Cheairs v. State ex rel. Dep’t of Transp. & Dev., 03-0680 (La.12/3/03), 861 So.2d 536, 541. A trial court’s decision to qualify an .expert will not be overturned absent an abuse of discretion. Johnson, 63 So.3d at 99. Generally, the failure to object to evidence admitted during trial constitutes a waiver of the right to object to its admissibility. Bates v. Denney, 563 So.2d 298, 300 (La.App. 1st Cir.), unit denied, 566 So.2d 961 (La.1990).

Comparative Fault

Louisiana Civil Code article 2323(A), which instituted comparative fault, provides that “[i]n any action for damages where a person suffers injury, death, or loss,” the fault of “all persons causing or contributing to the injury, death, or loss shall be determined.” McKenzie v. Imperial Fire and Cas. Ins. Co., 12-1648 (La.App. 1st Cir.7/30/13), 122 So.3d 42, 47-48, writ denied. 13-2066 (La.12/6/13), 129 So.3d 534. The trier of fact is owed some deference in allocation of fault, since the finding of percentages of fault is a factual determination. Duncan v. Kansas City S. Ry. Co., 00-0066 (La.10/30/00), 773 So.2d 670, 680-81, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001). Thus, a trier of fact’s allocation of fault is subject to the manifestly erroneous or clearly wrong standard of review. Smegal, 48 So.3d at 439.
In determining the percentages of fault, the trier of fact should consider both the | ^nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). These same factors guide the appellate court’s evaluation of the respective fault *448 allocations. See Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, 611.

Damages

General damages are those that are inherently speculative in nature and cannot be fixed with mathematical certainty. Miller v. LAMMICO, 07-1352 (La.1/16/08), 973 So.2d 693, 711. Much discretion is left to the judge or jury in the assessment of general damages. See LSA-C.C. art. 2324.1. The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. Id. In assessing general damages in a personal injury case, a court must consider the severity and duration of the injured party’s pain and suffering. LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766, 772.
In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert, denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award | nwithin that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976); Broussard v. Razden, 98-2576 (La.App. 1st Cir.12/28/99), 763 So.2d 644, 654. In a review of the facts, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. It is important to note, however, that prior awards are only a guide. Miller, 973 So.2d at 711. In reviewing a general damage award, a court does not review a particular item in isolation; rather, the entire general damage award is reviewed for an abuse of discretion. Dennis v. The Finish Line, Inc., 99-1413 (La.App. 1st Cir.12/22/00), 781 So.2d 12, 30, writ denied, 01-0214 (La.3/16/01), 787 So.2d 319.
Special damages are those which have a “ready market value,” such that the amount of the damages theoretically may be determined with relative certainty, McGee v. AC And S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770, 774. A reviewing court should not set aside an award of special damages unless the award was based on factual findings that are found to be manifestly erroneous. See Kaiser v. Hardin, 06-2092 (La.4/11/07), 953 So.2d 802, 810.
ANALYSIS
Since some of the assignments of error are duplicative, we will deal with each of the issues presented, rather than the numerical sequence. One issue that is expressed in the assignments of error concerns a comment by plaintiffs’ expert, Dr. Jay Turkewitz, that “the patient bears no responsibility for [his] safety at all in a hospital facility.” Dr. Turkewitz did make this comment as part of his discussion of the correlative duties of the nurse, the hospital, and the patient, which also included other aspects of Keva’s care that he felt did not meet the standard of care. The defendants contend that the trial court legally erred by applying this statement as the standard of care, thus depriving them of the correct legal analysis of their duties as compared to the patient’s duties and *449 requiring this court to conduct a de novo review of the facts. However, it is clear from a reading of the entire reasons for judgment that this comment did not form the basis for the trial court’s judgment in this case. It was mentioned as part of the trial court’s reasons, but those reasons also referenced the opinions of several other experts who stated that Keva’s actions or inactions breached the standard of care. The Imtrial court also stated that it found Heather’s testimony to be credible; this finding established the fact pattern of the events leading to her fall. The trial court’s reasons then enumerated the specific facts upon which the experts’ opinions were based. We find no legal error in the trial court’s judgment as the result of the mention of Dr. Turkewitz’s statement, which was only one sentence in sixteen pages of the trial court’s written reasons for judgment. Therefore, de novo review is not warranted in this appeal, and the manifest error standard of review is applicable.
In its assignments of error, the LPCF states that the trial court erred in “failing to reconcile the factual evidence regarding the circumstances leading up to Plaintiff’s fall,” and that “a reconciliation of the facts shows the Plaintiff was clearly advised to wait for assistance and she refused to do so.” The trial court is not required to “reconcile” conflicting versions of events. The trial court may choose to accept one among many statements, and unless the record as a whole shows that this choice is unreasonable and clearly wrong, that choice will prevail. See Adams, 983 So.2d at 806. In this case, the trial court chose to believe Heather’s testimony. Therefore, we must review her testimony and the record as a whole to
determine whether that choice was manifestly erroneous.
Heather testified concerning the sequence of events preparing for the bath and leading to her fall. The upper half of her bed had been raised to allow her to sit up and breast-feed her baby. About 2:45 p.m., Keva lowered the upper half of the bed, lowered the bed rail, removed Heather’s Foley catheter and IV, raised the bed to a sitting position again, and put the bed rail back up. At that point, Keva asked Heather if she could feel her legs and whether she still had any tingling sensations. Heather said she did not feel the tingling any more, so she assumed it had stopped and told Keva that it had. The bed rail was up on the side of the bed; Keva lowered it and told Heather to swing her legs around and sit on the side of the bed while holding the bed rail to see how she felt in that position. Keva sat beside her and helped her sit up. Heather said Keva told her that when she started feeling as if she could stand, she should stand up by the side of the bed, indicating that her mother should stand beside her in case she felt dizzy or weak. While Heather sat and then stood at the bedside, |nKeva went in and out of the room several times, starting the bath water[4] and getting towels and other bath supplies. She asked Heather again how she was feeling, and Heather told her she felt OK.
After standing for a minute or two, Heather felt the urge to urinate, and told Keva that she needed to use the bathroom. Keva responded that the bathwater was almost ready, and she would take Heather to the bathroom in just a minute. Keva left the room again and came back with towels, and Heather repeated that she needed to use the bathroom. Keva went *450 into the bathroom and said, “Okay, it’s just about ready.” At that point, Heather’s mom took her arm, and Heather walked about two steps toward the bathroom. Heather said she could see Keva in the bathroom, in between the tub and the toilet. According to Heather, Keva saw her walking toward her and said, “All right, great, you’re here.” When Heather got to the doorway, her mother stepped back so Heather could get through. Heather took one step to cross the threshold and crumpled to the floor with her left leg bent underneath her. Heather said she felt no pain immediately after falling and while being moved to the bed by orderlies. According to Heather, she first experienced pain when the doctor came in and moved and lifted her foot to wrap and tape it.
Heather had read Keva’s deposition testimony some time before trial and pointedly disagreed with the nurse’s deposition statement that she had told Heather not to get out of bed. Heather stated, “She’s the one that put the bed rail down, took everything off of me, told me to put my legs up, told me to stand up, walked past me numerous times going to get towels in and out, saw me standing up.”
Heather’s mother, Carole Adams, was deposed, and her deposition was introduced into the record. With reference to the bath preparation, Ms. Adams said that when Heather agreed to have the bath, Keva said, “well, okay, I’ll get the bath ready,” and then told Heather to “get up on the side of the bed.” Ms. Adams said that, other than lowering the bed rail, Keva did not assist Heather in sitting up. Keva then went into the bathroom, and Heather sat up on the side of the bed. Heather then asked her mother to come and stand beside her while she sat and as she stood up. 1,¡While Heather was standing next to the bed, Keva left the room to get some towels and then came back. After standing a couple of minutes, Heather said she had to go to the bathroom, so she and her mother started to walk towards the bathroom where Keva was sitting on the side of the tub. Keva looked up and saw them coming and continued to monitor the bath water, saying, “Oh, good, you’re here.” A split second later, Heather fell. Ms. Adams said she never heard Keva tell Heather not to get out of bed until she could be there and assist her, and she also did not hear Keva tell Heather to wait at the bed until she came back to help her.[5]
Keva summarized the events immediately preceding the fall, as follows:
I do recall, I absolutely do remember, it was like a frozen frame, you know, rather a picture in my mind of the scene of the, the actions of me being in the restroom emptying her catheter and turning around and seeing her standing in the doorway and saying “I thought I told you to wait for me.” And she responded “I’m fíne.” And I turned back around to discard what I was doing.
And when I turned my back I heard whatever, the fall, and then turned back to her and did observe her on the floor....
Keva was asked what was meant by the orders of Heather’s obstetrician, Dr. Stefanie Schultis, that the Foley catheter could be discontinued when the patient was “reactive.” Keva explained that her un *451 derstanding of “reactive” was “to have complete normal sensation as though you have not had any anesthesia at all that day, complete normal sensation and have the ability to ambulate.” Dr. Schultis expressed the same definition of the word “reactive.” Keva’s entry on Heather’s chart at 1:38 p.m. stated that Heather had no complaints of dizziness, but “continues with tingling to the right leg,” which was a sign that Heather was still not ready to ambulate. Keva’s next notation at 2:45 p.m. stated, “Her [F]oley catheter was discontinued. The patient was in bed, the bath water running. Patient instructed to await assistance. No complaints of pain. Denies numbness or tingling in extremities or buttocks.”[6] Based on this assessment of Heather’s sensory functions, Keva stated her usual procedure was to |iafurther evaluate the patient’s motor function and consider allowing her to ambulate. She outlined a number of steps she would take in this evaluation, stating:
I would reiterate and ask again the series of questions [about sensations and ability to move her legs] and I would have her demonstrate for me what she was able to do or not. I would touch her. I would do the alcohol prep [touching her lower legs and feet with an alcohol-soaked pad to see if she could feel the cold]. That’s my preference. After that I would do a series of things for different reasons. I would set [her] up, yes, I would stand her next to [me], touching her physically.
I would stand her up with me next to the bed, in fact her legs touching the bed so that at any time she could sit back on the bed. We would take one step and stand still. Again, I would be beside her, physically touching the patient. We would stand there for a bit.
Then we would take another step and stand there. And then at that point we’re usually very close to where we’re going anyway. Then I would walk with her the rest of the way.’
Keva said she was unable to complete her customary assessment procedures, because Heather did not wait for her to come back; instead, Heather ignored her instructions, got out of bed, and walked to the bathroom.
Keva acknowledged that it was important that the patient be assisted by the nurse the first time she ambulates following an epidural and anesthesia. Keva also stated that it was customary to remove the Foley catheter before making a complete assessment of the patient’s ability to ambulate. Keva said her usual practice when the patient indicated she would like to bathe was to gather all of the supplies that may be needed, remove the catheter, turn the bath water on, and begin that process. She said she generally turned the bath water on before removing the catheter, because the tub was large and it took a long time for it to fill. Keva initially said she did not specifically recall instructing Heather to remain in bed until she came back to assist her; however, this was her usual practice. She said, “I would always instruct the patient to await assistance before getting out of the bed.... Because the patient is not qualified to assess if she [is] capable of ambulating safely close to epidural.” Later, Keva said that she was certain she would have given Heather that instruction. Keva said that her comment to Heather when she saw her in the bathroom doorway was, “I thought I told you to wait for me.”
114Keva stated that she lowered the bed *452 rail in order to remove the Foley catheter.[7] She said she had to lower it, because “[t]here is equipment, IV pumps, fetal monitoring machines next to this. You cannot get to the patient to remove a catheter unless you take the side rail down.” Keva said that after telling Heather to stay in bed, she did not think it was a breach of the standard of care to leave the bed rail down and the patient unattended while taking care of other matters in preparation for Heather’s bath. However, she admitted that if the bed rail had not been lowered and Heather left unattended, the fall in the bathroom would not have occurred. She explained that she had to leave the bed rail down while carrying the catheter bag to the bathroom, because her gloves at that point were not sterile; she would first “de-germ” herself, then return to the patient and raise the bed rail. Keva did not agree with Heather’s description of events, stating that Heather had either misremembered or lied about the facts. However, Keva admitted that if Heather’s account were accepted as true, it would have been negligence on her part to tell Heather to sit up and then to get up and stand by the side of the bed unassisted and unattended by her.
The main difference between Heather’s and her mother’s testimony and Keva’s testimony concerns whether Keva instructed Heather to remain in bed until she could assist her in getting up. After reviewing the varying descriptions of the events leading up to Heather’s fall, we find that there was a reasonable basis for the trial court to accept Heather’s testimony that Keva did not tell her to remain in bed while she prepared the bath and emptied the catheter bag. Keva’s testimony concerning this fact was somewhat equivocal. When asked if she specifically recalled instructing Heather to remain in bed until she came back to assist her, Keva responded, “Again, I don’t specifically remember our conversations. I would always instruct the patient to await assistance before getting out of the bed.” Moreover, there is nothing in the record as a whole that would suggest the trial court was manifestly erroneous in choosing Heather’s account over Keva’s, rather than “reconciling” the conflicting statements.
The most significant assignments of error are those pertaining to whether Keva’s actions or inactions breached the standard of care, and whether this breach was a 11ficause in fact of Heather’s injuries. The standard of care, which was expressed by several of the medical experts, required the nurse to fully evaluate the patient’s ability to ambulate before removing the catheter, because there was no need to remove the catheter until the patient was ready to get out of bed and use the bathroom. This was in accord with Dr. Schul-tis’s order that the Foley catheter could be discontinued when the patient was “reactive,” which, according to Keva, meant that the patient had completely normal sensation and the ability to ambulate. Other aspects of the standard of care included leaving the bed rail up while the patient was unattended, assisting the patient to sit and stand before attempting ambulation, and helping the patient take the first steps after having received an epidural. Finally, when Keva saw Heather standing alone in the bathroom doorway, she immediately should have stopped whatever she was doing and gone to Heather’s side.
*453 Dr. Paul Fuselier, a member of the medical review panel, originally agreed with the other panel members that there was no breach in the standard of care. However, after reviewing additional materials, he had changed his opinion. He testified at trial that on a birthing bed, such as was used in Heather’s room, there was no reason for Keva to lower the bed rail in order to remove the Foley catheter. He stated that it was a breach of the standard of care for Keva to lower that bed rail and leave it down while she left the patient unattended. He also said that even though Keva testified that she could not put the bed rail up, because her gloves were unclean after removing the Foley catheter, she could have used her elbow to raise it, could have asked a family member to raise it, or could have removed one glove to raise it. Dr. Fuselier also stated that in order to determine whether the patient is “reactive” before removing the catheter, as was ordered by Dr. Schultis, a full evaluation of the patient’s sensory responses and motor ability should have been done. He noted that Keva had admitted that this was not done before removing the Foley catheter and, in fact, was not done at all. Removing the catheter before performing a complete assessment was a violation of the doctor’s order and a breach of the standard of care. Dr. Fuselier also stated that it was a breach of the standard of care for Keva to turn her back on Heather after she saw her standing alone in the doorway of the bathroom. He stated:
|1fiAnd when she [Keva] is fooling with the Foley bag and catheter and she sees the patient standing there, I mean, there is a priority here. You throw that Foley bag in the garbage. That can be done anytime. And you go to the patient and assist the patient either back to the bed or as the nurse wanted, take a bath.
Dr. Turkewitz testified in his deposition that he had not examined Heather and had not reviewed any statements or depositions; he always based his opinions strictly on what was in the medical records. He said there was a clear dereliction of duty on the part of the nurse, primarily because “there was no neuromuscular examination about the ability of this patient to sustain weight prior to getting her out of bed. End of story.” Dr. Turkewitz reiterated that “regardless of what anesthetic agent you used, from a neurological perspective before you get a patient up you do a neuromuscular assessment to make sure the patient can bear weight, And that wasn’t done in this case.” He elaborated on his opinion, stating:
Hence, there’s a dereliction in duty. The patient’s safety was not addressed. As far as I’m concerned, the primary responsibility of nurses is patient safety.... This patient was not only not kept safe, this patient was put in an unsafe situation of the greatest degree. ... The patient was allowed to dangle over the side of the bed in a position where she was able to stand up. And she should have never been in that position to stand up on her own or with anyone’s assistance without a neuromus-cular examination.... The nurse was running the bath water. So, the nurse had every intention of getting that patient up without any evidence of her neuromuscular examination.... [A] side rail ... that’s down allows the patient to get up on their own easily.... [H]uman nature with patients is when the side rail is put down and they’re expecting to transfer themselves out of bed, particularly if they have any inkling that they can do it on their own, they will do it on their own. That’s why patients are not supposed to be left unattended by nurses.
Dr. Turkewitz said that even if Keva had told Heather to await assistance, as was *454 indicated on the 2:45 p.m. nurse’s notes on Heather’s chart, once Keva put the side rail down and went to draw a bath prior to doing a complete neuromuscular evaluation, there was a breach of the standard of care “without question.” He also clarified his statement that the only people responsible for patient safety in a hospital are doctors and nurses, explaining that this was his personal opinion, not a legal opinion. He was adamant that “you don’t put the side rails down unless you know the patient can — has the strength to ambulate.” And even if a full assessment has been done, the nurse should not just walk away and leave the patient in the bed with the bed rail down. Dr. Turkewitz summarized his opinion concerning the actions that constituted a breach of l17the standard of care, stating:
My opinion is very simple. It’s very simple and very straightforward. The nurse by her running the bath water had made the decision to get the patient up. She put the bed rail down without making certain the patient had the strength to walk. She subsequently left the patient unattended.
Nancy McNamara, R.N., a legal nursing consultant, also provided an opinion concerning the nurse’s standard of care in this case. She said that the primary body speaking to the standard of nursing care in labor and delivery is the Association of Women’s Health Obstetric and Neonatal Nursing. Its publications generally advise nurses that they are to make sure the epidural has worn off sufficiently before allowing a post-delivery patient to ambulate, and they are to assist the patient the first time she is up following an epidural. However, the association’s literature does not provide step-by-step instructions. McNamara also consulted publications in the anesthesia field, which generally specified the use of a modified Bromage score. She testified that in her experience, although the nurses did not call it by that name, those procedures were what the nurses used to assess the degree to which the motor block was wearing off on the patient. McNamara said that, based on her own experience, her review of the medical literature on the subject, and Keva’s actions as reflected in her charting, Keva had “deviated from the standard of care in terms that she apparently deemed the patient appropriate for a trial of ambulation without benefit of assessing her motor function.” She explained that her opinion was not based on anything particular in the notes, stating, “Rather, it is the absence of any reference to assessment of motor function in the notes.” McNamara said that generally the nurse is doing these assessments on a regular basis post-delivery in order to ascertain when motor function has returned. The first indication in the nurse’s notes on Heather’s chart that Keva was readying Heather for ambulation is the notation at 2:45 p.m., stating, “Foley discontinued with clear yellow urine. Patient in bed. Bath water running. Patient instructed to wait assistance. No complaint of pain. Denies numbness and tingling in extremities or buttocks.” McNamara said this would have been the time for Keva to conduct a motor function evaluation, which was not done, although Keva had made several notations concerning the return of sensory function. She also said that Keva was obviously intending to allow Heather to ambulate at 2:45 p.m., because she had __L^discontinued the Foley catheter, “[wjhich one would not do unless one were anticipating imminently ... that the patient was going to be ambulating.” McNamara also stated she found it odd that after removing the Foley catheter, the side rail was left down, and that according to the chart, Keva was doing the motor and the sensory evaluations at different times. McNamara *455 also noted that the sensory evaluation should have included objective tests, such as a pin prick or alcohol swab, in addition to asking for the patient’s subjective perception. She said that when addressing the wearing off of the epidural, that is ail done in one assessment, explaining:
Motor and sensory are two different things. And the thing that we need to be concerned about for walking is the degree to which her motor function has returned. The degree to which she has voluntary control over her muscle fibers and the normal strength of them back.
Also, given that Keva weighed only 107 pounds and Heather weighed about 220 pounds, McNamara said Keva needed to enlist the assistance of another staff member before Heather would have her first trial of ambulation, because Keva, alone, would not have been able to break Heather’s fall if she had fallen or if her knees had buckled. There was nothing in the medical records or in Keva’s testimony indicating Keva had taken any steps to obtain help with Heather’s first attempt to ambulate. McNamara stated that the preservation of the patient’s safety as it relates to ambulating after an epidural is virtually always in the realm of nursing care. The side rail should have been up, and the motor function assessment should have been complete.
It is true that, as the defendants contend, there were other medical experts in this case who opined that Keva had not breached the standard of care.[8] However, the trial court has the right to choose one or more expert opinions over others. Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous. Also, when the fact-finder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. Adams, 983 So.2d at 806-07. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of |, ¡¡conflicts in expert testimony. Id. at 807. Therefore, we conclude that the Aymamis established the standard of care applicable to Keva’s care of Heather and also established that this standard was breached in several particulars.
With reference to causation, the defendants argue that even if this court agrees with the trial court’s choice of witnesses to establish the facts, the standard of care, and the breach of the standard of care, none of the evidence shows that Keva’s actions or inactions caused Heather’s injuries. They contend that if Heather had stayed in bed as she was instructed to do, she would not have fallen and broken her leg. Therefore, her actions were the sole cause of her injuries. This argument begs the question, in that it accepts Keva’s testimony that she gave Heather instructions to stay in bed and wait for assistance before trying to get up and walk. However, the trial court accepted Heather’s version of events, which was that she was never told to stay in bed, but rather, was encouraged by Keva to get out of bed in order to take a bath. We found no manifest error in this selection by the trial court. Moreover, several of the medical experts agreed that even if Keva had told Heather to stay in bed, Keva’s ac *456 tions-removing the Foley catheter, running the bath water, and leaving the bed rail down-tacitly approved Heather’s decision to attempt to ambulate with the assistance of her mother after testing her own reactions by sitting and by standing beside the bed. Thus, the trial court’s implicit conclusion that Keva’s actions were a cause in fact of Heather’s injuries was not manifestly erroneous.
The defendants further contend that the trial court erred in failing to assign any degree of comparative fault to Heather. The trial court’s decision is reviewed for manifest error, using the factors set out in the jurisprudence to evaluate Heather’s actions. See Smegal, 48 So.3d at 439; Watson, 469 So.2d at 974; and Clement, 666 So.2d at 611. The first factor is whether her conduct resulted from inadvertence or involved an awareness of the danger involved in trying to walk too soon after having an epidural. Keva testified that she advised Heather several times about the need to wait until she had full strength and feeling back in her legs. However, Heather and her mother said that Keva began urging Heather to get up and take a bath while she was still nursing her baby. Heather was reluctant, because she wanted to continue relaxing 12nwith her baby and because she had been given epidural anesthesia during the birth of her first child eight years earlier and knew from that experience that it took almost a full day for the epidural to wear off. Keva assured her that the substances used in the epidural had changed, allowing earlier ambulation; the modern epidural was called a “walking epidural,” because it wore off much more quickly. Keva also told her that new mothers were being encouraged to get up as soon as possible to prevent blood clots from forming in the legs. After being asked for the third time whether she was ready to take a bath, Heather agreed. From these exchanges between Keva and Heather, it appears that Heather was aware of some degree of danger, but was being advised by her nurse that early ambulation was not as risky as it had been in the past. Heather actually felt pressured to agree to the bathing process before she was ready.
The degree of risk created by Heather’s conduct was succinctly summed up by Dr. Schultis, who, when asked what would be the risk of getting up too soon after anesthesia, responded, “We just saw it,” referring to Heather’s fall. She agreed that Heather’s fall was one of the major risks that would be envisioned by getting a patient out of bed too soon. The significance of what was sought by Heather in leaving the bedside and walking toward the bathroom was slight. She could have taken a bath at any time and could have used a bedpan or bedside commode in order to urinate.
Evaluating Heather’s capacities, whether superior or inferior, she would definitely be in an inferior position in this circumstance. She was tired from the labor and delivery process, was still experiencing some degree of disability from the epidural, and was in the care of someone else, her nurse, who was encouraging her to get up and walk as soon as possible. She deferred to what she believed was Keva’s greater knowledge and experience in postpartum care.
The last factor to be considered is whether there were any extenuating circumstances that might require the actor to proceed in haste, without proper thought. As previously discussed, Heather felt pressured to take a bath. After the Foley catheter had been removed and she had stood at the bedside for a few minutes, she felt the urge to urinate. She told Keva twice that she needed to use the toilet.
*457 Her mother was there to assist her in walking to the bathroom, so she thought she could safely take the 12)few steps to get there.
Based on this analysis of the relevant factors in assessing Heather’s degree of fault, we find that the trial court had a reasonable factual basis for concluding that she was not at fault in this accident. Our review of the record as a whole does not suggest that this finding was clearly wrong. Accordingly, we must affirm the trial court’s finding.
Finally, there is a dispute about the amount of damages awarded. The Aymamis contend the amount awarded to Heather in general damages was abusively low, as was the amount awarded to her husband and children for their loss of consortium. Addressing first the award of general damages in the amount of $100,000 to Heather, we recognize that this amount is on the low side for the severity and duration of her injuries. However, we do not find that it is so low that it is an abuse of the much discretion given to a trial court when assessing general damages. The same is true for the loss of consortium awards to Jeremy, Savanna, and Logan. Therefore, we will not modify these awards.
The LPCF claims the award of $29,300 in lost wages should be reduced by at least half. The LPCF contends that Heather is entitled to only nine months of lost income, because she did not accept the position that was offered to her when she was finally cleared to return to work thirteen months after her fall. We disagree. Heather testified that the employer told her that her job would not be available to her, but a lower-paying position could be offered to her at another location. The new position would have required a daily commute across the Causeway to either New Orleans or Metairie, with no additional compensation for the gasoline and tolls that this commute would entail. In addition, she would have had to pay for before- and-after-school care for her daughter, making the new job at lower wages an untenable option. Accordingly, we find that there was a reasonable factual basis for the trial court’s award, and the record does not reveal that the trial court was clearly wrong in awarding this amount.
CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to Keva Fontanille, R.N., St. Tammany Parish Hospital Service | {¡¡¡District No. 1, and the Louisiana Patient’s Compensation Fund.
AFFIRMED.

. When the LPCF is defending an action for excess damages after a plaintiff has settled with a healthcare provider, the status of the LPCF is in the nature of a statutory interve-nor. Miller v. LAMMICO, 07-1352 (La.1/16/08), 973 So.2d 693, 702 n. 13.

. The anesthesiologist, Dr. Patrick McCaslin, stated the epidural pump would have been turned off after the delivery about 11:20 a.m. However, there was no notation in the medical records that this was done at that time. Keva charted that the pump was off when she checked it at 12:15 p.m. Therefore, the exact time at which the epidural anesthetic was discontinued is unclear.

. There is significant conflict in the testimony surrounding the process of preparing for Heather's bath and the events immediately preceding her fall. These discrepancies are detailed later in this opinion.

. On cross examination, Heather said it was possible that Keva had started the bath water before removing the catheter and IV. Keva said she generally started the bath water before removing the catheter.

. Jeremy Aymami’s deposition was also in the record, but his description of events did not correlate with Heather’s testimony, her mother's testimony, or Keva’s testimony. For instance, he stated that as Heather sat on the side of the bed, she complained to Keva several times that she could not move her legs. Heather consistently testified that she could move her legs throughout the labor and delivery and had no problem moving her legs following the delivery, even before the effects of the epidural had subsided.

. Keva later stated that this note on Heather’s chart probably was not made contemporaneously with those events at 2:45 p.m. It was made some time after she fell.

. There was a great deal of discussion at trial concerning whether the bed had two rails or four. Regardless, Keva stated she lowered a bed rail and left it down while she went to empty the catheter bag and prepare the bath. This correlates with Heather's testimony and her mother's testimony.

. The defendants argue that the plaintiffs’ medical experts were either unqualified or provided testimony that was inconsistent and implausible, so the trial court erred in accepting their opinions. However, the depositions of all of the experts, other than Dr. Fuselier, who testified at trial, were jointly submitted by the parties in lieu of live testimony without any objections. As such, any objections to the admissibility of the experts’ opinions on behalf of the plaintiffs were waived and cannot be raised on appeal.